Filed 7/28/17

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| DENNIS M. RUSH, et al.,<br><br>        Plaintiffs and Appellants,<br><br>v.<br><br>WHITE CORPORATION, et al.,<br><br>        Defendants and Respondents. | A145758<br><br>(San Francisco County<br>Super. Ct. No. CGC12522648) |

Spanish Peaks is a 3000-acre luxury resort in Big Sky Country, Montana, a development begun in 2002 by Spanish Peaks Holdings II, LLC (Holdings).  The featured residences at Spanish Peaks were to be "high end settlement cabins," to be constructed close to a massive lodge, which was to be the centerpiece of the development, containing restaurants, stores, recreation facilities, and other amenities.  Beginning in 2004 the five plaintiffs here acquired 13 properties in Spanish Peaks, eight undeveloped lots and five with cabins on them, one of which cost over $3,000,000.  By July 2011 all but two of the 13 properties had been lost, usually by foreclosure.

In July 2012 a complaint was filed by one plaintiff, joined in September by the four others, whose first amended complaint named seven defendants, not including the developer Holdings, which was bankrupt.  The essence of the case was fraud and negligence in construction and in soil remediation, the fundamental claim being that Spanish Peaks was a "landslide complex."  Interestingly, though four of the five plaintiffs had taken title to the properties via LLCs, the lawsuit was brought in their individual names.

Four of the defendants moved for summary judgment, on several separate, and independent, bases, including lack of standing, no duty, no causation, and various

1

defenses based on the purchase documents. The number of parties, the complexity of the various transactions, the relationships—more accurately, lack of relationships—between the five plaintiffs and the many defendants, and the financial details of the individual plaintiff's situation necessarily led to a lengthy statement of undisputed material facts—338 facts to be precise, in 49 pages.

Plaintiffs' separate statement in response was 155 pages, a statement that did not comply with the Rules of Court, improperly citing to numerous undisputed material facts for specific arguments in the opposition, which undisputed material facts were then supported by multiple paragraphs of multiple declarations, at times by every paragraph of nearly every declaration on file.

Defendants' reply brief called plaintiffs on this and, following a hearing, the trial court agreed and entered an order to address the issue. Plaintiffs' response was still not proper, as a result of which the court issued an order entitled "order mandating compliance with California Rule of Court 3.1350." Plaintiffs' supplemental separate statement still did not comply, and following another hearing the trial court granted the motion for summary judgment based on plaintiffs' noncompliance—as the summary judgment statute expressly provides.

Plaintiffs appeal, presenting six questions for decision, most of which address the claimed lack of merit in defendants' motion, issues the trial court did not reach. We conclude the trial court did not abuse its discretion in granting the motion on the basis it did, and we affirm.

## The Proceedings Below

### *The Complaint*

The lawsuit started with a complaint on July 19, 2012 filed by one plaintiff, Dennis Rush, against one defendant, White Corporation. Two months later came a first amended complaint (FAC) in which four others joined, so that there were now five plaintiffs: Rush, David Flaherty, J. Christopher Fleming, Frank McGuyer, and Michael DeFelice.

2

The FAC also named six more defendants in addition to the originally named White Corporation: James Dolan, Voyager Group, Spanish Peaks Realty LLC, Rivers to Peaks Realty, American Land Development LLC, and Treadwell & Rollo.[1] And concerning the defendants, the FAC alleged this:

"9.  Defendant James Dolan ('Dolan') is an individual residing, on information and belief, in Pittsburgh, Pennsylvania.  Dolan is a principal and controlling owner of Defendant Voyager Group ('Voyager'), a Pennsylvania limited partnership.  Dolan and Voyager at all times were principals and controlling owners of Defendants Spanish Peaks Realty LLC, Rivers to Peaks Realty, and American Land Development LLC (collectively known herein as 'Dolan Defendants'), at all times acting on behalf of those entities, and other related entities.  Dolan Defendants also owned and controlled . . . 'Holdings' . . . .

"10.  All the defendants are principals, agents, employees, employers, partners, joint venturers and/or co-conspirators acting jointly and in concert and within the scope of their authority.

"11.  At all times Dolan acted as representative and agent of Defendant Voyager; and Defendants Voyager and Dolan acted as representatives and agents of Spanish Peaks Realty LLC, Rivers to Peaks Realty and American Land Development LLC, and also of Holdings, the Spanish Peaks Homeowners Association, The Club at Spanish Peaks ('Club'), and The Lodge at Spanish Peaks ('Lodge').  Club and Lodge are presently in Chapter 11 Bankruptcy proceedings.

The FAC was titled for "Unfair Business Practice; Negligence; Fraud and Deceit; and Breach of Fiduciary Duty."  In fact, the FAC alleged three other causes of action, styled "Negligence-Property Damage," "Breach of Warranty," and "Strict Products Liability."  The Dolan defendants were named in the first, second, third and fourth causes of action.  The sixth and seventh causes of action were against only American Land Development and Treadwell and Rollo.

---

[1] Rivers to Peaks Realty was a DBA for Spanish Peaks Realty, and thus plaintiffs did not pursue the action against Rivers to Peaks.

3

The FAC was lengthy, 184 paragraphs, describing in great detail plaintiffs' version of what occurred. Distilled to its essence, the FAC alleged that Dolan and the other Dolan defendants all worked on behalf of, and in conspiracy with, each other (as well as two bankrupt entities, including Holdings); that the Dolan defendants failed to disclose to plaintiffs the development was riven with active landslides and bordered by earthquake faults, as a result of which plaintiffs suffered property damage; that the Dolan defendants failed to disclose the financing risks that put in jeopardy the construction of the highly touted lodge, some of which risks were caused by the cost of soil remediation; and that the Dolan defendants had inadequately remediated the soil.

Following some service issues, in July 2013 a joint answer was filed on behalf of six defendants: Dolan, White Corporation, Voyager, Spanish Peaks Realty LLC, Rivers to Peaks Realty, and American Land Development LLC.

### *The Motion for Summary Judgment*

On June 20, 2014, four of the defendants, Dolan, Voyager, Spanish Peaks Realty LLC, and American Land Development LLC filed a motion for summary judgment or, in the alternative, summary adjudication, set for hearing on September 5. It was accompanied by a 23-page memorandum of points and authorities, a separate statement of undisputed material facts, and five declarations, of Dolan, Benjamin Schnayerson, William Genge, Cory Berkram, and Douglas Hein, representatives of the various defendants. The declarations described the defendants, descriptions that included the following:

Spanish Peaks Realty was the exclusive real estate agent for the properties that had been sold by Holdings before it went bankrupt.

American Land Development performed master planning of the development, entitlement of the development, and administration of construction. It was a separate and distinct entity that provided its services to Holdings, and did not itself construct any of the buildings at Spanish Peaks.

4

Voyager was a private equity firm that invested indirectly in Holdings. It had no active role in the operations of Holdings or the development, and had no dealings whatsoever with any of the plaintiffs.

James Dolan was an officer and/or director of Voyager and Spanish Peaks Realty. He was not involved with the day-to-day management, construction, or administration of the development. And he had no dealings, directly or indirectly, with any of the plaintiffs concerning their purchases.

Defendants' motion addressed in great detail the plaintiffs, their backgrounds, and their acquisitions of the properties. Fleming was described as a speculative investor who purchased nine properties within the development. Flaherty, McGuyer, and DeFelice each purchased a single property, Flaherty purchasing his on the secondary market and not through any entity affiliated in any way with the defendants. The original plaintiff Rush was a former employee of Spanish Peaks Realty, and the seller's agent for many of the properties at issue, who acted as his own agent for one parcel he purchased on the secondary market.

Defendants' motion also described in detail the terms of each of the plaintiffs' purchases. For example, as to the eleven properties purchased from Holdings, each was bought via a purchase and sale agreement under which the buyer represented that he or she would inspect the property and that the seller, Holdings, was not responsible for the condition or value of the property. More specifically, the agreements included provisions that prior to closing the buyer is required to approve the physical condition of the property 20 days after the purchase and sale agreement is executed; that buyer is responsible for the costs associated with any testing of the property that the buyer may wish to conduct; that seller makes no representations regarding soil condition, wetlands, environmental matters, water, or value of the property; and that buyer represents that he or she will fully inspect and examine the property.[2] The motion asserted that Holdings as

---

[2] Illustrative language from one of the purchase and sale agreements with Holdings was as follows: "Buyer will fully inspect and examine the Property. Buyer is relying on its own independent judgment regarding the Property's value, condition and

5

seller and its employees and agents did not owe a duty to disclose to the buyers, who were relying on their own judgment regarding his property's value, condition and potential usage.

In addition, because plaintiffs' complaint included the claimed failure to disclose that some unspecified geotechnical issues rendered their properties unsuitable for building, the motion demonstrated that in fact Holdings commissioned geotechnical testing, which testing showed that "Phase 3A"—the area within the development containing the developed property purchased by the plaintiffs—was suitable for building. Finally, the motion noted that not one plaintiff made any complaint about any undeveloped parcel prior to the time the property was sold in foreclosure.

Speaking of foreclosure, the motion also recited what defendants describe as "a litany of loan defaults, unpaid property taxes, unpaid club dues and charges, foreclosures, trustee sales and one personal bankruptcy. The multitude of financial shortcomings and problems—coming on the heels of the financial crisis, burst real estate bubble, and credit crunch—explains why, despite the absence of geotechnical problems, the Plaintiffs lost so many properties to foreclosure or trustee's sale." Defendants' brief goes on to describe in detail the following facts as to plaintiffs Fleming, Flaherty, DeFelice, and Rush:

Fleming was in default on the bank loan he took out to buy the nine properties in Spanish Peaks[3]; he was arrears on his taxes, his club dues, and his fees.

---

potential use. Buyer is not relying on any representations or statements of Seller except as expressly contained in this Agreement. Buyer will be taking the Property in an AS IS condition, subject to all defects, whether apparent or latent, now existing or hereafter discovered. Buyer acknowledges that neither Seller nor any of its agents or employees has made any warranties or representations upon which Buyer has relied concerning: (a) the investment value of the Property, (b) utility rates or charges, (c) the possibility or probability of profit or loss resulting from ownership of the Property, or (d) the tax consequences that may result from the purchase of the Property."

[3] Fleming had numerous real estate holdings, including a home in Denver; a farm in Wisconsin that he turned into a residential development of several hundred homes; a

Flaherty was in default on his loan for at least six (perhaps twelve) months prior to foreclosure; he declared bankruptcy four months later; and he testified the recession "ruined his business."

DeFelice was in arrears on his taxes.

Rush was unable to service the debt on the three properties he owned, and lost the property on trustee's sales.[4]

As apparent from all the above, the facts that needed to be in defendants' separate statement were necessarily voluminous. And that they were, 338 facts to be precise.

Defendants' motion made several separate arguments in support of the motion, including that: (1) plaintiffs (except for McGuyer) had no standing because they were not the owners of the properties, which were in fact owned by LLCs; (2) plaintiffs could not prove causation; and (3) defendants had no duty to disclose.

As to the lack of causation argument, the motion argued that plaintiffs' primary claim—that defendants failed to disclose that some unspecified geotechnical issues rendered their properties unsuitable for building—could not be proved, as the undisputed evidence demonstrated that Holdings commissioned geotechnical testing that concluded the section of the development in which plaintiffs' properties were located ("Phase 3A") was suitable for building. The argument also contended that any losses suffered by plaintiffs had nothing to do with any undisclosed geotechnical issues. To the contrary, nine of the 13 properties involved were lost to foreclosure, most of which went into

---

condominium in Vail; and numerous properties in Mexico. He also rented homes in Chicago and Palm Beach County, Florida.

[4] The fifth plaintiff, McGuyer, continued to own the cabin he bought from Holdings. The cabin experienced some problems caused by post-construction soil settlement, and was largely repaired at a cost of $11,000, which McGuyer paid. McGuyer is satisfied with the cabin following the repairs, and indeed had praise for the Spanish Peaks development and its amenities, and hopes to continue to use them. McGuyer testified that he did not know any of the defendants, and did not know what they did or failed to do that was wrong. Nevertheless, after meeting with Fleming and Rush, McGuyer joined the lawsuit.

default in 2008–2009, years before discovery of the claimed geotechnical problems in 2011.

Plaintiffs filed their opposition on August 22. And quite an opposition it was—2241 pages. The opposition included a 25-page memorandum of points and authorities, normal enough. It also included two requests for judicial notice seeking judicial notice of over 500 pages of material. And it included eight declarations, including by each of the five plaintiffs, which with attachments totaled 217 pages. The other three declarations were from plaintiffs' attorneys, totaling 1232 pages. Plaintiffs' opposition also included objections to evidence. Finally, and pertinent to the issue here, plaintiffs filed a responsive separate statement, a statement that was 155 pages long.

Defendants filed their reply papers on September 2, including a brief, objections to plaintiffs' evidence, and a response to plaintiffs' separate statement. Significant to the issue here, the first sentence of the introduction on the first page of defendants' reply brief raised plaintiffs' failure to comply with California Rules of Court, rule 3.1350 in their opposition. As defendants described it, "Plaintiffs cite to numerous 'undisputed material facts' for specific arguments in the Opposition, and those 'undisputed material facts' are then supported by multiple paragraphs of multiple declarations, and at times, every paragraph of nearly every declaration on file." Defendants asserted that plaintiffs' position, that defendants were agents of one another or constituted a single entity, was unsupported by specific citations to evidence as required by California Rules of Court, rule 3.1350(f). So, the argument ran, plaintiffs' unsupported contention failed to properly dispute defendants' undisputed material facts that were supported by properly cited evidence. As the case cited by defendants put it, "[o]verly general references to supporting evidence . . . may place an undue burden on busy trial courts . . . and need not be tolerated." (*Parkview Villas Assn., Inc. v. State Farm Fire & Casualty Co.* (2005) 133 Cal.App.4th 1197, 1214 (*Parkview Villas*).

### *Judge Wong Becomes Involved, and Ultimately Grants Summary Judgment*

Two days after defendants' reply was filed, the presiding judge assigned the case to an able, and most experienced, trial judge—the Honorable Garrett L. Wong.

8

On November 21, Judge Wong continued defendants' motion for summary judgment for hearing to January 16, 2015. In addition, considering the parties' correspondence regarding outstanding discovery and case management matters, Judge Wong issued various orders, including a schedule for the parties to supplement their prior submissions regarding their motion for summary judgment, specifically requiring plaintiffs to supplement their opposition papers.

On December 15, defendants filed their supplemental separate statement, consisting of an additional 189 undisputed material issues/facts, along with claimed supporting declarations and exhibits of deposition records. And on December 16, plaintiffs filed their supplemental memorandum of points and authorities, separate statement of undisputed material facts, and supporting declarations and exhibits. Plaintiffs' opposition now totaled 5269 pages.[5]

On January 8, 2015, defendants filed a supplemental reply to plaintiffs' supplemental opposition, arguing that plaintiffs not only failed to address defendants' supplemental briefing, but, in defendants' words, "have bombarded the . . . Defendants (and the Court), filing 60 separate documents comprised of nearly ten thousand of pages of material . . . , including 11 new declarations, volumes of exhibits, and 155 additional 'facts' in support of the opposition." Defendants argued that the newly added facts amounted to suppositions unsupported with specific evidentiary citations, and that plaintiffs' supplemental opposition should be disregarded due to violation of California Rules of Court, rule 3.1350(f) and (h). Defendants responded to plaintiffs' supplemental separate statement of additional 155 undisputed material facts, disputing them because the claimed facts were "vague, ambiguous, and overbroad," "not material" and "lacks foundation." And defendants contended that plaintiffs addition of new "facts" again

_____

[5] On December 18, plaintiffs filed blanket objections to defendants' separate statement, broadly citing to the recently submitted evidence which consisted of the declaration of Dolan's recent deposition, reserving the right to make appropriate objections to evidence at the hearing. In addition, plaintiffs disputed defendants' undisputed material facts citing to declarations of various parties, and broadly citing to their new additional facts 1–155.

required defendants, and Judge Wong, to dig through thousands of pages of materials to determine whether any of plaintiffs' suppositions were based in fact, once again in violation of California Rules of Court, rule 3.1350(f) and (h).

On January 13, 2014, Judge Wong issued an order he entitled "Order Mandating Compliance with California Rule of Court 3.1350 and Continuing Hearing on Motion for Summary Judgment/Summary Adjudication to February 6, 2015." Judge Wong continued the hearing because he was unable to evaluate the papers due to both sides' issues with their respective supplemental separate statements. Referring specifically to plaintiffs, Judge Wong observed that they failed to provide pinpoint citations to evidence in their opposition to defendants' supplemental separate statement, which was "a clear violation of subsection (f) of CRC 3.1350." Judge Wong noted that plaintiffs had filed broad citations to facts responding to defendants' 338 UMF, and that plaintiffs had in some cases failed to respond at all to defendants' supplemental separate statement filed on December 15, 2014. Accordingly, he ordered plaintiffs to respond to defendants' separate statement with "pinpoint" citations to facts.

Citing to *Parkview Villas*, Judge Wong's order noted he was not required to take on the burden of reviewing thousands of pages of evidence submitted with motions for the purpose of determining the basis of a fact where a party has failed to comply with the California Rules of Court regarding separate statement formatting. Both sides were ordered to file corrected supplemental separate statements that complied with all requirements of California Rules of Court, rule 3.1350.

Amended responses to supplemental separate statements were filed by both plaintiffs and defendants on January 30, and plaintiffs filed additional amended responses on February 3. Again, plaintiffs' papers were inadequate. As plaintiffs' themselves describe the situation in their brief, Judge Wong "ordered each side to conform to California Rule of Court 3.1350(f), which included 'pinpoint' citations. [¶] Thereafter, Plaintiffs offered 'pinpoint' cites, but rather than repeat and repeat cites to oppose Defendants' 425 Facts, often referenced some of its own 155 Additional Material Facts which admittedly required the Court to refer to Plaintiffs' efficiently marshalled facts.

10

[¶] Rather than being pleased that Plaintiffs had collected for the Court's convenience the dispositive facts in but a few key locations (most notably Plaintiffs' Additional Material Facts 52-59 ('PAMF'), the Court expressed annoyance that it had to 'flip back and forth' because, 'When one also considers that Defendants' Separate Statement includes 425 facts, it becomes . . . unreasonable.' " In sum, in plaintiffs' own words, plaintiffs' papers "admittedly required" Judge Wong to do something he should not be required to do.

On February 6 Judge Wong issued his tentative ruling granting the motion for summary judgment. The tentative ruling discussed plaintiffs' failure to comply with California Rules of Court, rule 3.1350, again citing to the holding in *Parkview Villas*.

Judge Wong heard argument on the motion on February 9, a hearing that was lengthy indeed. During that hearing, plaintiffs' counsel contended that defendants had "no problem" addressing the additional supplemental facts submitted in plaintiffs' supplemental separate statement. Counsel also argued that their original separate statement "was not an issue for the Court," and that the requirement to make the separate statement compliant with the California Rules of Court caught counsel "off guard" after discovery was conducted.

Judge Wong responded that plaintiffs had been on notice of their noncompliant separate statement as early as September 2014, when defendants addressed this issue in their initial reply brief. And, Judge Wong reminded plaintiffs' counsel, he himself had provided notice of the problems with plaintiffs' separate statements on more than one occasion and had given plaintiffs the opportunity to correct the errors in advance of the hearing.

Following the hearing, Judge Wong entered his order granting summary judgment. Judgment was thereafter entered, from which plaintiffs filed a timely appeal.

## DISCUSSION

11

**The Summary Judgment Statute—and the Law**

"The purpose of the law of summary judgment is to provide courts with a mechanism to cut through the parties' pleadings in order to determine whether, despite their allegations, trial is in fact necessary to resolve their dispute. [Citation.]" (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843 (*Aguilar*).) To that end, the rules dictating the content and format for separate statements are to "permit trial courts to expeditiously review complex motions for . . . summary judgment to determine quickly and efficiently whether material facts are disputed." (*United Community Church v. Garcin* (1991) 231 Cal.App.3d 327, 335 (*Garcin*).)

As Witkin describes it, opposition to a summary judgment "must contain a separate statement that (1) indicates whether the opposing party agrees or disagrees with the moving party's assertion that specific material facts are undisputed [citation], (2) sets forth plainly and concisely any other material facts that the opposing party contends are disputed, and (3) refers to the supporting evidence for each contention (C.C.P. 437c (b)(3)." (6 Witkin, Cal. Procedure, (5th ed. 2008), Proceedings Without Trial, § 218, p. 657.) The proper format for the separate statement is illustrated at California Rules of Court, rule 3.1350(f). And the Witkin passage concludes—just as the summary judgment statute expressly provides—this way: "Failure to comply with this requirement of a separate statement may constitute a sufficient ground, in the court's discretion, for granting the motion." (Code Civ. Proc. § 437c (b)(3); see *Oldcastle Precast, Inc. v. Lumbermens Mutual Casualty Co.* (2009) 170 Cal.App.4th 554, 568; *Batarse v. Service Employees Internat. Union, Local 1000* (2012) 209 Cal.App.4th 820, 831–833.)

Since the ruling below was one within Judge Wong's discretion, necessarily our standard of review is whether that discretion was abused. (*Collins v. Hertz Corp.* (2006) 144 Cal.App.4th 64, 67; *Parkview Villas, supra*, 133 Cal.App.4th at p. 1208.)

12

Attacking Judge Wong's decision, plaintiffs have filed a 76-page, 13,923-word brief that uses the word "discretion" three times, twice in quotations from cases.[6] And at no point does plaintiffs' brief expressly argue that Judge Wong abused his discretion.

Plaintiffs' brief has a six-page introduction, a 12-page "procedural history," and a 20-page "statement of facts," setting forth a claimed version of facts that, plaintiffs apparently contend, should have caused the motion to be denied on the merits. That, of course, is not what Judge Wong did.

Plaintiffs' opening brief then goes on with a 31-page section it refers to as "Discussion," which discussion sets forth six questions it asks the reader. We will answer those questions (to the extent we understand them), but first decide the issue before us: whether Judge Wong abused his discretion. And conclude he did not.

## Judge Wong Did Not Abuse His Discretion

We discussed the concept of abuse of discretion at length in *People v. Jacobs* (2007) 156 Cal.App.4th 728, 736–738. We began as follows:

"Various definitions and principles describing the abuse of discretion standard of review have been stated and repeated in numerous cases, such as in *Blank v. Kirwan* (1985) 39 Cal.3d 311, 331, that we will set aside a trial court ruling only upon a showing of ' " 'a clear case of abuse' " ' and ' " 'a miscarriage of justice.' " ' As to what is

---

[6] Here are the three references to "discretion":

"First, *Parkview* requires of denial of Defendants' Motion, not the granting of it. . . . Nonetheless, the *Parkview* court held that the trial court did not have the discretion to enter a judgment for failure of specific citations:

"[A] trial court faced with an opposing party's defective statement plainly indicating which proposed material facts are disputed and including at least general references to the evidence supporting its position *does not have the discretion to enter a judgment against that party* solely as a result of that party's failure . . . to provide sufficiently specific citations to the evidence supporting its position.

"Terminating sanctions have been held to be an abuse of discretion unless the party's violation of the procedural rule was willful . . . or, if not willful, at least preceded by a history of abuse of pretrial procedures, or a showing less severe sanctions would not produce compliance with the procedural rule."

required to show such abuse, it has been said that a trial court abuses its discretion only when its ruling ' " 'fall[s] "outside the bounds of reason." ' " [Citation.]' (*People v. Benavides* (2005) 35 Cal.4th 69, 88); accord, *Denham v. Superior Court* (1970) 2 Cal.3d 557, 566 [abuse of discretion requires a showing that the trial court ' "exceed[ed] the bounds of reason, all of the circumstances before it being considered" '].) More colorfully, it has been said that discretion is abused only when the trial court's ruling is arbitrary, whimsical, or capricious. (*People v. Linkenauger* (1995) 32 Cal.App.4th 1603, 1614; *People v. Branch* (2001) 91 Cal.App.4th 274, 282; see *People v. Gimenez* (1975) 14 Cal.3d 68, 72 [' "capricious disposition or whimsical thinking" '].)"

We went on to describe other possible descriptions, quoting from *City of Sacramento v. Drew* (1989) 207 Cal.App.3d 1287, 1297, that " 'Very little of general significance can be said about discretion. " 'The discretion of a trial judge is not a whimsical, uncontrolled power, but a legal discretion, which is subject to the limitations of legal principles governing the subject of its action, and to reversal on appeal where no reasonable basis for the action is shown. [Citation.]' " (*Westside Community for Independent Living, Inc. v. Obledo* (1983) 33 Cal.3d 348, 355, citing to 6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 244.) The scope of discretion always resides in the particular law being applied, i.e., in the "legal principles governing the subject of [the] action . . . ." ' "

And we concluded our discussion with this: "All this is well described in Witkin where, likewise citing the still vital *Bailey v. Taaffe* [(1866)] 29 Cal. 422, 424, the author distills the principle as follows: 'Limits of Legal Discretion. [¶] The discretion of a trial judge is not a whimsical, uncontrolled power, but a legal discretion, which is subject to the limitation of legal principles governing the subject of its action, and to reversal on appeal where no reasonable basis for the action is shown. (See 5 Am.Jur.2d, Appellate Review § 695.) . . .' (9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 358, pp. 406–407.)" (*People v. Jacobs, supra*, 156 Cal.App.4th at p. 738.)

The law regarding what is required in a responsive separate statement is set forth above. The facts as to what plaintiffs filed, both initially and after Judge Wong's orders,

14

are also set forth.  And in the course of the argument on the motion, Judge Wong confronted plaintiffs' counsel concerning what had occurred.  This is how he described it:

"THE COURT:  One thing:  . . . I'm saying your oral remarks today omit the fact that the filing on September 2nd—it was a reply brief in response to your motion.  In response to the opposition to the motion for summary judgment, there is a statement, at least in the introduction and in the body of the document and again the conclusionary reply, 'The Plaintiffs' opposition is procedurally defective because they have overwhelmed Defendants and the Court with documents and objections.'  That in some ways is understood, but more importantly to the Court, Mr. Kelly [counsel for defendants] identifies and says, 'failed to specifically cite to evidence to support their undisputed material facts.'

"[Y]ou are on notice as early as September of last year that this was a problem, but yet you file an opposition—a supplemental opposition here which contains the same problems, as far as the Court's concerned.  We give you a warning, and you don't follow through.

"So what's your answer to that?  You've at least had two or three warnings from not only Defendants, but from the Court about this issue.  Why should I give you another chance here?  It is not a mere technicality.  It is a procedural problem that I see here, and we gave you the opportunity—that is, the Court gave you the opportunity to amend your opposition and your [separate] statement here to conform with the rules of court and the Parkview court."

As indicated above, the critical issue of plaintiffs' failure to comply with California Rules of Court, rule 3.1350 was raised in the motion papers, in argument, and in court orders, the last of which could not have been clearer, given its title:  "Order Mandating Compliance with California Rule of Court 3.1350 . . . ."  Despite repeated notice in various forms, and extensions of time to correct the errors, plaintiffs failed to comply with the Rules.  As Judge Wong stated in his ruling, the court "advised the parties that failure to comply with the prior order and California Rule of Court 3.1350 would

15

result in the motion being decided against the noncompliant party." Plaintiffs had several opportunities to correct their error, but instead repeated and compounded it.

Judge Wong here did not act arbitrarily. Or whimsically. Or capriciously. And certainly not in any way inconsistent with established law. Indeed, he did precisely what he should have done, illustrated by *Parkview Villas*, the primary case relied on by plaintiffs.

In *Parkview Villas* the trial court granted summary judgment to an insurer based on the failure of plaintiff homeowner's association to file an adequate separate statement. The Court of Appeal reversed, but not on any basis offering solace to plaintiffs here. After first confirming the various defects in plaintiff's separate statement there—defects, not incidentally, similar to the defects in plaintiffs' statement here (*Parkview Villas*, *supra*, 133 Cal.App.4th at p. 1210)—the Court of Appeal held as follows: "There is no doubt Parkview Villas's failure to comply with these requirements for a separate statement made the task of the trial court more difficult. [Citation.] And we do not question the right of a trial court to refuse to proceed with a summary judgment motion in the absence of an adequate separate statement from the opposing party. [Citation.] But the proper response in most instances, if the trial court is not prepared to address the merits of the motion in light of the deficient separate statement, is to give the opposing party an opportunity to file a proper separate statement rather than entering judgment against that party based on its procedural error. [Citations.]" (*Parkview Villas, supra*, at p. 1211.)

Judge Wong did just as *Parkview Villas* said. He postponed the hearing, to allow plaintiffs to submit a proper separate statement. Despite this, despite notice and opportunity—indeed, opportunities—to cure the defects, plaintiffs did not. Plaintiffs' proposal for the court "to flip back and forth through their Separate Statement to cross-reference each of Defendants' facts with the facts Plaintiffs cited" in order to make up for plaintiffs' failure to include pinpoint citations to evidence was, according to Judge Wong, easier said than done. It would require the court to cross-reference numerous additional facts plaintiffs included, which Judge Wong noted was unreasonable.

16

*Collins v. Hertz Corp.*, *supra*, 144 Cal.App.4th 64 is persuasive. There, summary judgment was granted for defendants based on plaintiffs' inadequate separate statement. The Court of Appeal affirmed. The court began with a description of the purpose of the rules, citing and discussing *Aguilar* and *Garcin*, and the purpose and goal of the separate statement. And the court went on, "That goal is defeated where, as here, the trial court is forced to wade through stacks of documents, the bulk of which fail to comply with the substantive requirements of section 437c, subdivision (b)(3), or the formatting requirements of rule 342, in an effort to cull through the arguments and determine what evidence is admitted and what remains at issue. The realization of this goal is so important that the Legislature has determined '[f]ailure to comply with this requirement of a separate statement may constitute a sufficient ground, in the court's discretion, for granting the motion.' (§ 437c, subd. (b)(3).)" (*Collins v. Hertz Corp., supra*, 144 Cal.App.4th at pp. 72–73.)

The court then described the nature of plaintiffs' failure to comply with the rules, and then observed that the "trial court presciently adopted the prudent course outlined by our colleagues later that year in *Parkview Villas*." (*Collins v. Hertz Corp., supra*, 144 Cal.App.4th at p. 73.) And the court summed up: "The separate statement serves two important functions in a summary judgment proceeding: It notifies the parties which material facts are at issue, and it provides a convenient and expeditious vehicle permitting the trial court to hone in on the truly disputed facts." And "A busy trial court's task is made extremely difficult if a party opposing summary judgment fails to comply with the requirements of rule 342, stating unequivocally whether a fact is undisputed or not and, if not, stating the nature of the dispute and identifying the evidence supporting its contention." Then, after discussing *Parkview Villas,* the court concluded that the trial court did not abuse its discretion. "The trial court specified deficiencies in appellants' initial filing, identified the precise manner in which those deficiencies could be rectified, and afforded appellants ample opportunity to prepare new papers in compliance with applicable rules. Precisely this and no more was required." (*Collins v. Hertz Corp., supra*, 144 Cal.App.4th at pp. 74–75.)

17

Likewise here. Judge Wong's treatment of the situation was careful. And thoughtful. And fair. He did not abuse his discretion.

## The Questions in Plaintiffs' Discussion
## Are All Answered Unfavorably to Plaintiffs

As described above, plaintiffs' brief sets forth six discussion items, all framed as questions, labelled "A" through "F." Items "A," "B," and "C" essentially ask whether the motion should have been denied on the merits, as follows:

"A. Was the Motion for Summary Judgment properly granted as to Defendant Dolan on the grounds that he owed no duty to any Plaintiff in his 'personal' capacity? . . . .

"B. Was summary judgment properly granted as to Defendant SPR? . . . .

"C. Should Summary Judgment have been granted in favor of Defendant ALD, and its Manager Defendant Voyager, when there is ample evidence that ALD was retained by the property owner to supervise construction, supervise the geotechnical engineer, obtain entitlements, and determine risk disclosure?"

Plaintiffs devote 18 pages of discussion to these items, setting forth at length plaintiffs' claimed version of the facts pertaining to Dolan, and his claimed involvement in Spanish Peaks, concluding "[t]he evidence of Dolan's direct participation in all decisions regarding the development of Spanish Peaks is overwhelming and undeniable." Such hyperbole is misplaced.

To begin with, this is not germane to the issue before us, and perhaps we need say no more. However, buried within item "A" is the assertion that "Defendant Dolan failed to shift the burden of production because he has not provided any evidence that he opposed the wrongful acts of any of the Defendant entities or that he took action to avoid harm to the Plaintiffs." Reading this as an argument that the motion should never have been granted in the first instance because defendants did not shift the burden to plaintiffs to file anything (see *Aguilar*, *supra*, 25 Cal.4th 826), we easily reject the argument.

By way of background, plaintiffs' opposition below contained a 15-line argument entitled "Defendants Will Not Meet Their Prima Facie Burden on [S]ummary Judgment."

18

The first 11 lines of the argument set forth boilerplate principles of summary judgment procedure, and then concluded with this: "Until Defendants meet this initial burden of disproving Plaintiffs' entire action with admissible evidence, Plaintiffs have no burden to oppose the motion. See e.g. *Consumer Cause*, 91 Cal.App.4th at 468; *Aguilar*, 25 Cal.4th at 850. Defendants cannot meet their prima facie burden because they have offered little to no authority or admissible evidence, and have misstated established facts and law to support their arguments."

Of course, defendants had offered authorities—more than a little—and also admissible evidence. But beyond that, as shown above there was much more to defendants' motion than the argument that Dolan had no duty. For example, defendants argued that plaintiffs (except McGuyer) were not proper plaintiffs. This shifted the burden to plaintiffs to show that they were. Defendants showed, on at least two separate bases, there was no causation, shifting the burden to plaintiffs to show that there was. Defendants showed there was no failure regarding the soil issue, shifting the burden to plaintiffs to show that there was. And the motion showed that some of the properties were bought "as is," and that plaintiffs could not perform financially.

Turning to item "B," concerning defendant Spanish Peaks Realty, plaintiffs again cite to the claimed duty owed by a real estate agent and the various disclosures that an agent must make. And the argument asserts, "Having mounted no evidence that they made appropriate disclosures to Plaintiffs, it is abundantly clear that SPR did not shift the burden of production to Plaintiffs." What was said above regarding item "A" is equally applicable here.

As to item "C," pertaining to defendants American Land Development and Voyager, plaintiffs do not assert that defendants failed to shift the burden. No more need be said.

Items "D," "E," and "F" also ask whether summary judgment should have been denied, but (to the extent we understand the items) apparently not based on any substantive basis, but for procedural reasons. Thus item "D" asks "Should the Court have refused to review Plaintiffs' detailed 'pinpoint' citations to dispositive evidence merely

19

because they were in Plaintiffs' Additional Material Facts?" This question has a subpart, which plaintiffs frame this way: "Did Plaintiffs' marshalling of Undisputed Material Facts 'pinpoint' citations in Plaintiffs' own Additional Material Facts violate the Court's January 13, 2015 Order?" The item goes on to fault Judge Wong for not giving adequate "instruction" to plaintiffs.

To the extent this item asserts that we somehow conclude that plaintiffs did not "violate" Judge Wong's order, we note that he did not grant summary judgment due to plaintiffs' violation of his order, but rather plaintiffs' repeated failure to comply with California Rules of Court despite being given opportunities to correct these failures in advance of the court's ultimate ruling. Plaintiffs' other subargument in item "D" that also references "some technical breach of the Court's January 13, 2015 Order"[7] is flawed for the same reasons.

Question "E" asks the question "Should Summary Judgment have been denied because Defendants offered 425 Undisputed Material Facts in support of their Motion for Summary Judgment, many of which were irrelevant, vague, and/or argumentative?" We do not understand this. The volume of facts was due to the number of plaintiffs, the number, and variety, of defendants, and the number of properties. In any event, such a claim was not made below. It has no place here. (*Greenwich S.F., LLC v. Wong* (2010) 190 Cal.App.4th 739, 767.)

Question "F" asks: "Should Summary Judgment have been denied on the grounds that Defendants refused to comply with Plaintiffs' discovery requests and valid court orders, and refused to produce any Person Most Knowledgeable on behalf of the corporate defendants?" Apparently plaintiffs are requesting we reverse because somehow Judge Wong proceeded improperly vis-à-vis discovery. We will not.

---

[7] The second subquestion reads as follows: "2. Assuming arguendo some technical breach of the Court's January 13, 2015 Order requiring 'pinpoint' citations, did such a breach permit the Court to ignore Plaintiffs' Additional Undisputed Material Facts containing pinpoint citations?"

20

**DISPOSITION**

The judgment is affirmed.  Defendants shall recover their costs on appeal.


_____
Richman, J.


We concur:


_____
Kline, P.J.


_____
Stewart, J.


A145758; *Rush v. White Corp.*

21

Trial Court:   San Francisco County Superior Court

Trial Judge:   Hon. Garrett L. Wong

Counsel:

O'Connor and Associates, John D. O'Connor, Jessica C. Shafer for Plaintiffs and Appellants.

Dillingham & Murphy, Dennis J. Kelly for Defendants and Respondents.