Filed 11/13/24  P. v. Cejacortes CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>          v.<br><br>KEVIN DANIEL CEJACORTES,<br><br>     Defendant and Appellant. | G062577<br><br>(Super. Ct. No. 22CF3422)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Scott A. Steiner, Judge. Affirmed.

Tonja R. Torres, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Daniel Rogers, Collette C. Cavalier and Maxine Hart, Deputy Attorneys General, for Plaintiff and Respondent.

\*     \*     \*

Kevin Daniel Cejacortes was upset upon learning the victim, R.G., had placed a "Do not park here" sticker on his mother's car, which was illegally parked in front of R.G.'s business. Cejacortes confronted R.G. and brandished a knife. Cejacortes was convicted of assault with a deadly weapon (Pen. Code § 245, subd. (a)(1)) and sentenced to the middle term of six years in state prison.[1]

Cejacortes alleges the trial court abused its discretion in declining to find his psychological/childhood trauma was a mitigating sentencing factor, pursuant to section 1170, subdivision (b)(6)(A), which would support a lower term sentence. We disagree and affirm the judgment.

STATEMENT OF FACTS

*A. Prosecution Case*

R.G. worked as a real estate broker in Santa Ana. Various cars had been illegally parking in a spot which blocked access to his building's dumpsters. RG. had to pay the trash collection company $135 each time to return to pick up the trash. At R.G.'s request, the city applied a fresh coat of red paint to the curb and ticketed cars that illegally parked there. Nevertheless, a particular car consistently parked in the spot. In November 2022, R.G. placed a "Do not park here" sticker on the car's window.

That evening, R.G. was working in the building after regular business hours with W.P., a colleague, and R.G.'s teenage son, A.G. There were multiple offices on the second floor which opened onto an exterior walkway. R.G. and W.P. were in the office at the end of the walkway, farthest from the stairs. A.G. was in another office on the second floor. Around 7:30 p.m., they heard someone in the exterior walkway, yelling and banging on the

---

[1]All statutory references are to the Penal Code.

2

doors. When R.G. opened the door, he saw Cejacortes halfway down the external walkway. Cejacortes was walking toward R.G. and yelling that R.G. had done something to his mother. Because R.G. did not recognize Cejacortes at first, he stated that he did not know who Cejacortes was talking about and did not know his mother.

W.P. came outside onto the walkway. A.G. did not come outside but could see some of the confrontation from inside the building. R.G. and W.P. approached Cejacortes to find out what was going on. Cejacortes asked why R.G. had put a sticker on his mother's car. R.G. then recognized Cejacortes as a neighbor who lived next door to the building. R.G. did not know that the car belonged to Cejacortes's mother at the time he put the sticker on the car.

Cejacortes asked R.G. to go downstairs so he could "beat the shit out of" him. R.G. told Cejacortes to leave or he would call the police. Cejacortes, who was still shouting at R.G., had his hands in his jacket pockets. R.G. held his open hands out at chest height to prevent Cejacortes from coming closer. Although R.G. may have touched Cejacortes, he did not hit or push him. When he was approximately two or three feet away from R.G., Cejacortes took a large knife out of his pocket with his right hand.

Cejacortes swung the knife toward R.G.'s left side. As he did so, W.P., who was standing to R.G.'s right, grabbed Cejacortes's hand before it reached R.G. W.P. held onto Cejacortes's hand and pulled him away from R.G. Both R.G. and A.G. then called 911. W.P. continued to hold Cejacortes's hand, while telling him to stop and to calm down. W.P. could smell alcohol on Cejacortes's breath. After W.P. said they were going to call the police, Cejacortes said he was going to let go of the knife. After Cejacortes put down

3

the knife, W.P. picked it up and gave it to R.G. The knife, which was between five and 10 inches long, was a folding knife with the blade open.

R.G. and W.P. told Cejacortes that the police were on the way, and he should leave. When Cejacortes asked for his knife back, W.P. replied he would only give it back after Cejacortes left. W.P. then followed Cejacortes down to the parking lot. Cejacortes ran next door to his house as police arrived.

## B. Defense Case

Cejacortes's defense was that he brandished the knife in self-defense against R.G. and W.P. Defense counsel highlighted alleged inconsistencies in R.G.'s and W.P.'s statements, which demonstrated they were downplaying their own role as aggressors and exaggerating Cejacortes' violence.

## PROCEDURAL HISTORY

Cejacortes was charged with assault with a deadly weapon (§ 245, subd. (a)(1); count 1) and resisting and obstructing a police officer (§ 148, subd. (a)(1); count 2). The information alleged a prior prison term (§ 1170, subd. (h)), a prior serious felony (§ 667, subd. (a)(1)), and two prior strikes (§§ 667, subds. (d), (e)(2)(A), 1170.12, subds. (b), (c)(2)(A)). The alleged priors and prison term arose from Cejacortes's 2017 voluntary manslaughter conviction (§ 192, subd. (a)) and participation in a criminal street gang (§ 186.22, subd. (a)). Before trial, the prosecutor dismissed count 2, and the court dismissed the criminal street gang strike prior conviction. A jury found Cejacortes guilty of count 1.

## A. *Challenge to Prior Felony Conviction*

At the time of trial, Cejacortes had a pending petition to vacate his 2017 manslaughter conviction and to be resentenced pursuant to recent changes in homicide law. Prior to sentencing in the present case, the court informally discussed with defense counsel a possible global resolution. The court stated it would sentence Cejacortes to no more than six years in the current matter—the middle term, doubled for the strike prior—if Cejacortes agreed to resolution of his petition in the 2017 case. Several days before sentencing, Cejacortes's petition was resolved by redesignating his 2017 manslaughter conviction as assault with a deadly weapon and sentencing him to time served of three years.

## B. *History of Trauma and Mental Health Issues*

Cejacortes's sentencing brief argued he was entitled to imposition of the lower term of two years pursuant to section 1170, subdivision (b)(6)(A), because he had "experienced psychological, physical, or childhood trauma," which "was a contributing factor in the commission of the offense." The sentencing brief set forth Cejacortes's history of mental illness and childhood trauma, relying on his jail records and medical records from OC Health Care Agency (Agency), where he had recently sought mental health treatment.

Approximately two weeks before the assault, Cejacortes went to the Agency for a psychological evaluation because he was experiencing "depression, isolation, anger, low frustration tolerance, anxiety, audio hallucinations, visual hallucinations, mood swings and poor concentration and focus." He also reported feeling paranoia because he kept seeing the same license plate and therefore felt he was "being followed and watched." The medical report described Cejacortes's symptoms as being "so severe that [he was] an imminent risk of requiring move[ment] to a higher level of care

and placement." The therapist recommended Cejacortes obtain crisis services and a mental health assessment, and work on developing coping mechanisms. Cejacortes was told to return to the Agency in two weeks for a psychiatric evaluation.

At Cejacortes's follow-up appointment, which occurred earlier on the same day of the assault, a psychiatrist prescribed him "Abilify . . . an antipsychotic to help with his hallucinations and depression, Lexapro to assist with his anxiety and depression, and Vistaril for anxiety and sleep." The doctor described Cejacortes as "evasive, aggressive, demanding, manipulative, oppositional, uncooperative, [and] impulsive." Cejacortes denied suicidal ideation or harming others. He refused to tell the doctor whether he had a history of trauma or abuse. The doctor's notes questioned the accuracy of Cejacortes's denial of past or current substance abuse. Although Cejacortes told the doctor he had been arrested more than 20 times and had been incarcerated for more than 10 years, he would not say when or why. He further stated that the police were conspiring against him.

Cejacortes's sentencing brief also cited his jail records, which indicated he had been diagnosed with posttraumatic stress disorder (PTSD). Cejacortes told the psychiatrist he was prescribed Lexapro and Abilify when he was in jail, but he had not been given the medication at the time he was released.

The sentencing brief also cited a telepsychiatry appointment a month after Cejacortes's arrest. This record stated Cejacortes had a history of PTSD and dependence on alcohol, stimulants, and marijuana. Cejacortes reported his medications were helping but asked for an increase because he stated he was still experiencing anxiety, depression, and auditory hallucinations. The psychiatrist accordingly increased his dosage.

6

*C. Probation and Sentencing Report*

Cejacortes was interviewed by a probation officer, whose report was provided to the court for consideration prior to sentencing. The report listed "bipolar disorder and past trauma" as "past health issues." During the interview, Cejacortes provided the following background:

Cejacortes's father died when he was two years old. He had a good relationship with his mother and stepfather. He divided his time between his mother's home in Orange County and his grandmother's home in Mexico. His grandmother was "very violent" but "tried her best."

Cejacortes began regularly drinking alcohol when he was five years old. His grandmother placed him in a substance abuse program at the age of seven. While at the program, he was deprived of food, was emotionally and physically assaulted, and witnessed other children die. His grandmother withdrew him from the program after six months because she noticed he had bruising. The program caused emotional trauma which continued to impact his life.

He returned to the United States to live with his mother. Over the next few years, he lived intermittently in Mexico and the United States, attending school in both countries. He once changed schools after biting a teacher. Between the ages of eight and 14, he was drinking alcohol every day.

Cejacortes joined a gang at the age of nine. He was arrested at age 15 for robbery, and the following year for manslaughter. He reported that, after testifying in the manslaughter trial, members of his former gang labeled him a "drop out" and were trying to kill him. He and his family had moved away from his neighborhood to try to get away from his former gang. However, he still armed himself and looked over his shoulder. He was housed in protective custody at the time of the interview.

Cejacortes reported he rarely drank alcohol, but he continued to use marijuana beginning when he was seven. He had used hallucinogenic mushrooms seven or eight times, heroin for approximately one month, and methamphetamine three times.

He was prescribed psychotropic medication in 2017, when he was first diagnosed with bipolar disorder and schizophrenia. Although his medication was helping, he continued to hear voices. He vowed to take his medications when he was released from custody and acknowledged his mental condition would worsen if he did not. The probation officer did not know whether Cejacortes was taking his prescribed medications at the time of the offense.

Cejacortes wanted to continue working in landscaping, get a high school diploma, and move out of state, where he believed he and his family would be safer.

The probation report noted Cejacortes had prior felony convictions for voluntary manslaughter, participation in a criminal street gang, and possession of ammunition by a prohibited person. He had twice been ordered to serve additional jail time for postrelease community supervision (PRCS) violations, both of which were considered additional felony convictions. Additionally, he had misdemeanor convictions for driving under the influence of drugs, resisting a peace officer, battery, and three counts of hit and run. The present offense occurred only seven months after he was convicted of the battery.

Pursuant to rule 4.421 of the California Rules of Court, the probation report listed the following circumstances in aggravation: (1) the crime involved the threat of great bodily harm; (2) Cejacortes was armed with a knife at the time of the crime; (3) the manner in which the crime was carried out indicated planning because Cejacortes was aware of the ongoing parking dispute and decided to confront R.G. about it; (4) he had engaged in violent conduct that indicated a serious danger to society; (5) his prior convictions were numerous and increasingly serious; (6) he served prior prison terms in 2017 and 2019; and (7) his prior performance on supervision was unsatisfactory because he had multiple violations and was returned to custody. There were no noted mitigating circumstances.

D.  *Court's Sentencing Determination*

The trial court held a bifurcated trial on the sentencing allegations. The court found true that Cejacortes served a three-year prison term in the 2017 case, as well as the allegations that the prior assault with a deadly weapon was a serious felony and a strike prior. The court struck the five-year enhancement for the prior serious felony but declined defense counsel's request to strike the strike prior.

Defense counsel argued Cejacortes's mental health issues, particularly his PTSD, contributed to the commission of the offense by noting that, when Cejacortes learned of R.G. placing the sticker on his mother's car, "he was overcome with anger and frustration and decided to go and confront the victim next door."

The court considered Cejacortes's sentencing brief and the probation report and made clear it was aware of section 1170, subdivision (b)(6). The court agreed with defense counsel Cejacortes had "various underlying issues" which could be considered psychological and/or childhood

9

trauma. However, the court concluded Cejacortes had failed to demonstrate this trauma was a "contributing factor" to the commission of the crime. The court noted Cejacortes was angered over R.G. placing the sticker on his mother's car but there was no connection shown between Cejacortes's mental illness or childhood trauma and confronting R.G. over the sticker.

The court further found that, even assuming the lower term presumption applied, "imposing the lower term would be contrary to interest of justice." The court sentenced Cejacortes to the middle term of three years, doubled for the strike prior, for a total of six years in prison.

At the end of the sentencing hearing, defense counsel argued that "one would be hard-pressed to say" Cejacortes's mental health issues did not contribute to his commission of the current offense. Defense counsel noted, "Maybe I should have called a psychologist to explain that better . . . ." Defense counsel also pointed out Cejacortes had voluntarily sought help for his mental health problems at the time of the offense.

The trial court replied it was "not a failure of proof" by defense counsel because, even if the court were to find Cejacortes's trauma was a contributing factor in the offense, it would not impose the lower term because it would be contrary to the interests of justice as the aggravating factors outweighed those in mitigation.

DISCUSSION

I.

IMPOSITION OF THE MIDDLE TERM

Cejacortes argues the trial court abused its discretion in concluding his childhood trauma and mental health diagnoses did not contribute to the commission of the crime. Cejacortes contends his childhood trauma and PTSD made him "highly protective of his family," thus

10

contributing to his confrontation with R.G. because Cejacortes perceived the sticker on his mother's car as an "attack against his mother." Therefore, he asserts the court abused its discretion in refusing to sentence him to the lower term, pursuant to section 1170, subdivision (b)(6)(A). We find the trial court did not abuse its discretion in concluding Cejacortes failed to establish a connection between his psychological trauma and the commission of the crime. However, even if the trial court abused its discretion, any error was harmless beyond a reasonable doubt.

A. *Standard of Review*

A trial court's exercise of sentencing discretion is reviewed for abuse of discretion. (*People v. Moran* (2016) 1 Cal.5th 398, 402.) "A trial court will abuse its discretion . . . if it relies upon circumstances that are not relevant to the decision or that otherwise constitute an improper basis for decision." (*People v. Sandoval* (2007) 41 Cal.4th 825, 847, superseded by statute on another ground as stated in *People v. Lynch* (2024) 16 Cal.5th 730.) "'To prove an abuse of discretion, "'the burden is on the party attacking the sentence to clearly show that the sentencing decision was irrational or arbitrary.'"'" (*People v. Fredrickson* (2023) 90 Cal.App.5th 984, 988 (*Fredrickson*).) However, "'"'in the absence of such a showing, the trial court is presumed to have acted to achieve legitimate sentencing objectives, and its discretionary determination to impose a particular sentence will not be set aside on review.'"'" (*Ibid.*) Accordingly, in determining whether a trial court abused its discretion, a reviewing court considers "whether there is sufficient, or substantial, evidence to support the court's finding that a particular factor was applicable." (*People v. Hicks* (2017) 17 Cal.App.5th 496, 512.)

11

## B. *The Trial Court Did Not Abuse Its Discretion*

Effective January 1, 2022, section 1170 was amended to limit the court's sentencing discretion and to require the imposition of the lower term in certain circumstances. (Stats. 2021, ch. 731, § 1.3.) Thus, the court "shall order imposition of the lower term if any of the following was a contributing factor in the commission of the offense: [¶] (A) The person has experienced psychological, physical, or childhood trauma, including, but not limited to, abuse, neglect, exploitation or sexual violence." (§ 1170, subd. (b)(6).) "[T]his provision establishes a presumption of the lower term if the defendant's [childhood trauma] was a 'contributing factor' in [the] commission of the crime '*unless* the court finds that the aggravating circumstances outweigh the mitigating circumstances that imposition of the lower term would be contrary to the interests of justice . . . .'" (*People v. Flores* (2022) 73 Cal.App.5th 1032, 1039.)

Here, the trial court reasonably concluded Cejacortes did not demonstrate his childhood trauma or mental illness was a "contributing factor" in his commission of the offense. (*See Fredrickson, supra,* 90 Cal.App.5th at p. 991) [noting "there must be some initial showing" that a factor set forth in section 1170, subdivision (b)(6) contributed to commission of the crime].) Cejacortes failed to make the required "initial showing" that his mental health struggles or childhood trauma contributed to his decision to confront R.G. with a knife in response to R.G. placing a sticker on his mother's car to try to curtail her illegal parking. In fact, defense counsel recognized the lack of evidence demonstrating a connection between Cejacortes's psychological trauma and his commission of the crime, acknowledging "[m]aybe [he] should have called a psychologist to explain [it] better."

Moreover, the defense failed to explain why Cejacortes's actions were necessarily the product of psychological trauma, rather than other, more prosaic reasons. For instance, because W.P. testified he smelled alcohol on Cejacortes's breath, the trial court could reasonably have concluded his decision to confront R.G. was due to alcohol's well-known tendency to lower inhibitions. The testimony of a mental health professional might have distinguished Cejacortes's actions as necessarily caused by his mental illness or trauma but no such evidence was presented.

Instead, Cejacortes essentially asks the court to assume a chain of causation based upon speculative inferences, i.e., that his PTSD and childhood trauma made him feel protective of his mother, which in turn "trigger[ed his] impulsive response to confront [R.G.]" for placing a sticker on his mother's car. However, in the absence of any evidence, such as an expert's report or testimony, that directly connects Cejacortes's childhood trauma or mental illness to the offense, we are unpersuaded he is entitled to a lower term sentence under section 1170, subdivision (b)(6). Accordingly, the trial court's similar conclusion does not constitute an abuse of discretion.

## C. Any Alleged Error Was Harmless

Even if the trial court abused its discretion in finding Cejacortes's childhood trauma and mental illness did not contribute to his commission of the offense, we find any error harmless. "Under [*People v. Watson* (1956) 46 Cal.2d 818, 836], a reviewing court must reverse if 'it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.'" (*People v. Hendrix* (2022) 13 Cal.5th 933, 944.) A trial court's decision to sentence a defendant to a lower, middle, or upper term is reviewed for harmlessness under *Watson*. (*People v. Zabelle* (2022) 80

13

Cal.App.5th 1098, 1112, overruled on another ground in *People v. Lynch* (2024) 16 Cal.5th 730, 768-769.)

Here, the trial court explicitly stated that, even if Cejacortes had demonstrated his mental illness or childhood trauma contributed to the offense, it nevertheless would not have imposed the lower term given the significant aggravating circumstances. The probation report identified six factors in aggravation and no mitigating factors. In a bifurcated trial, the court found true that Cejacortes served a three-year prison term in the 2017 case, as well as the allegations the prior assault with a deadly weapon was a serious felony and a strike prior.

Moreover, as noted in the probation report, Cejacortes's significant criminal history justified the court's refusal to impose the lower term: both Cejacortes's prior and current convictions for assault with a deadly weapon were serious, violent felonies; he served prior prison terms in 2017 and 2019; he had six prior misdemeanors; and he had committed two probation violations for which he was returned to custody. Because Cejacortes's actions demonstrated a continuing danger to the public, he was not entitled to the presumption of a lower term sentence.

Accordingly, because the record clearly indicates the trial court would not have imposed the lower term even if Cejacortes had shown his mental and childhood trauma were contributing factors to his commission of the assault, any alleged error was harmless under *People v. Watson, supra,* 46 Cal.2d 818, 836. We therefore reject Cejacortes's claim of error.

14

DISPOSITION

The judgment is affirmed.


                                    SANCHEZ, J.

WE CONCUR:


MOORE, ACTING P. J.


GOODING, J.

15