Filed 2/1/22  Nusbaum v. Central Valley Concrete CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| DANIEL NUSBAUM et al.,<br><br>Plaintiffs and Appellants,<br><br>v.<br><br>CENTRAL VALLEY CONCRETE, INC.,<br><br>Defendant and Respondent. | F080863<br><br>(Super. Ct. No. 16CV-03290)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Merced County.  Brian L. McCabe, Judge.

Haffner Law Group and Matthew M. Haffner for Plaintiffs and Appellants.

Manning & Kass, Ellrod, Ramirez, Trester, David V. Roth, Kevin H. Louth and Steven J. Renick for Defendant and Respondent.

-ooOoo-

Plaintiffs Daniel Nusbaum and Iris Nusbaum (the Nusbaums) appeal from the grant of summary judgment in an action brought against Central Valley Concrete, Inc. (Central Valley) for the death of their son.  The Nusbaums contend that the trial court erred when it did not sua sponte continue a summary judgment hearing to allow the

Nusbaums time to obtain new counsel and to prepare and file a different opposition accompanied by a separate statement and supporting evidence. The Nusbaums also contend that the trial court erroneously granted the summary judgment on the ground Central Valley was immune under Civil Code section 846.[1]

First, we reject the claim of procedural error and conclude that the trial court did not abuse its discretion by not sua sponte continuing the summary judgment hearing for a third time. Second, we conclude Central Valley carried its initial burden by making a prima facie showing for the application of the section 846 immunity for landowners against claims involving nonpaying recreational users of their property. Furthermore, the Nusbaums did not show there was a triable issue of material fact regarding the application of the immunity or its exceptions.

We therefore affirm the judgment.

## FACTS

Central Valley owned and operated a 10-acre property located near Highway 59 in Merced County (the Property). The Property was primarily a trucking yard and ready-mix concrete plant, not open to the general public. Signage posted at the Property's entrance warned that all visitors had to check in at the Property's office, had to announce themselves and who they were with, and had to be accompanied if Central Valley allowed them anywhere on the Property.

On Monday, November 17, 2014, Luke Nusbaum, the Nusbaums' 22-year-old son, walked onto the Property wearing socks and no shoes, using a gait one employee described as a train walk—that is, "[l]ike when you're a kid and you act like you're a train." Luke was training to become a Buddhist monk, and when he entered the Property he was practicing "kinhin" — walking meditation in a place with loud noises. Luke had not been invited onto the Property by anyone at Central Valley.

---

[1]     Subsequent undesignated statutory references are to the Civil Code.

2.

After entering the Property, Luke walked in the direction of supervisor Jose Sandoval who had just gotten out of a truck. As their paths intersected and they were about five feet apart, Sandoval asked Luke, "Can I help you?" Luke looked toward the truck wash and a silo further into the Property, pointed in that direction, made a grunting noise, and began to sprint in that direction. Sandoval assumed Luke knew the employees at the truck wash and was running to go talk to them. Sandoval did not immediately run after Luke. A diesel mechanic, Eligio Nunez, came up to Sandoval after Luke began running and said something was not right about him. Sandoval said yes to Nunez and followed Luke. Nunez followed behind Sandoval. Sandoval estimated he sprinted after Luke a couple of seconds before Luke reached the silo and started climbing its ladder. When Sandoval saw Luke grab the ladder to the silo, Sandoval yelled for Luke to stop. A sign chained to the ladder and its cage stated: "Authorized Personnel Only." Luke ignored the sign and proceeded to climb the ladder. When Luke was halfway up the ladder, Sandoval yelled a second time for Luke to stop. Employees on the other side of the silo who were washing trucks also yelled "stop" and "hey, what are you doing." After reaching the top of a silo, Luke fell to his death.

Three security cameras on the Property captured images of Luke. The contents of the video recordings are described later in this opinion. This incident was the only known time that any uninvited member of the general public had entered the Property and attempted to climb any of the silos.

## PROCEEDINGS

In October 2016, the Nusbaums sued Central Valley for wrongful death and survivorship, alleging negligence based on Central Valley leaving the Property open to entry and its employees chasing Luke when they encountered him on the Property. In February 2017, the Nusbaums filed a first amended complaint (FAC), which is the operative pleading in this appeal. The FAC alleged Central Valley was negligent because it left the gates to the Property open, failed to place trespass signs or take other action to

3.

prevent entry, failed to place warnings and safety equipment around the silos and other dangerous equipment, and failed to train its employees the proper way to approach someone they believed should not be on the property. The FAC also alleged that Central Valley employees did not identify themselves to Luke as employees, chased him, called him names, and threatened to do physical harm. The FAC alleged Luke saw the silo as the only place that afforded him safety and an employee continued to chase Luke up the ladder, even though the employee knew or should have known that chasing Luke up the ladder created a risk Luke would lose his balance and fall to his death. Central Valley's May 2017 answer included a general denial and raised the landowner immunity set forth in section 846 as its 18th affirmative defense.

In August 2017, Central Valley filed a motion for summary judgment and adjudication, asserting that the Nusbaums could not prove negligence and raising suicide as an independent intervening act that prevented the Nusbaums from proving its negligence a proximate cause of Luke's death. In November 2017, Central Valley's motion for summary judgment was granted in part and denied in part. The trial court's order eliminated the Nusbaums' survivorship causes of action and allowed the negligence claim to proceed.

In December 2018, the trial court granted Central Valley's ex parte application to continue the trial based on the parties' joint stipulation and set a new trial date of March 26, 2019. In March 2019, the trial court granted the Nusbaums' unopposed application to continue the trial date and set a new trial date of October 15, 2019.

On June 25, 2019, Central Valley filed a second motion for summary judgment, asserting that it was immune from liability for Luke's death because he was an uninvited, nonpaying recreational user of the Property. Central Valley argued that under section 846 it owed no duty to the Nusbaums to (1) close the Property or otherwise prevent the public from entering the Property, (2) place warnings or safety equipment on the silos and other dangerous equipment located on the Property, or (3) to train its employees how

to approach members of the public who entered the Property uninvited. The hearing on the motion was set for September 13, 2019.

Three days after the summary judgment motion was filed, the Nusbaums' attorneys filed a motion to be relieved as counsel, citing their clients' failure to cooperate. The trial court denied the motion on procedural grounds, and on August 15, 2019, the Nusbaums' attorneys refiled their motion to be relieved as counsel. The refiled motion was noticed for hearing on September 12, 2019.

On August 21 and 22, 2019, substitution of attorney forms were filed, and the Nusbaums began representing themselves in the litigation. Appearing specially, the Nusbaums' former attorneys also filed an ex parte application to continue the summary judgment hearing, the trial date, and the discovery deadlines. Central Valley opposed the application to continue the summary judgment hearing.

On August 28, 2019, the trial court granted the Nusbaums' application for a continuance, vacated the September 13, 2019 hearing date on the summary judgment motion, and vacated the October 15, 2019 trial date. The Nusbaums did not attend the hearing and their former counsel appeared by telephone. To allow the Nusbaums time to obtain new counsel, the court set a trial setting conference for October 30, 2019, with the summary judgment hearing date and the trial date to be reset at the conference.

On October 28, 2019, the Nusbaums filed an ex parte application to further continue the summary judgment hearing, the trial, and the discovery deadlines. At the October 30, 2019 trial setting conference, the trial court granted the continuance, reset the summary judgment hearing for December 12, 2019, and reset the trial date for March 3, 2020.

Despite the two continuances, the Nusbaums were not able to retain new counsel. They proceeded in propria persona and, on December 2, 2019, filed a seven-page opposition to Central Valley's summary judgment motion. Their opposition did not specifically address Central Valley's asserted landowner's immunity conferred by section

5.

846. Instead, it asserted that there was no evidence that Luke committed suicide or was trespassing on the Property, that Central Valley did not take the necessary measures to safeguard persons on the Property, and that Central Valley was negligent in failing to secure the ladder on the silo from which Luke fell. The opposition also asserted that Central Valley's employees had caused Luke's death by chasing him to the silo while he was on the Property, and continued to chase him as he ascended the silo's ladder. The Nusbaums' opposition and its factual assertions were not supported by a separate statement of facts, affidavits, declarations, or exhibits.

At the end of the December 12, 2019, hearing on Central Valley's summary judgment motion, the trial court adopted its tentative ruling as the order of the court. The court concluded (1) Central Valley had established a prima facie case that it was entitled to immunity under section 846, (2) the burden shifted to the Nusbaums to establish a triable issue of fact, and (3) they failed to carry that burden. The court noted the Nusbaums' opposition did not address the immunity argument, was not supported by a separate statement of disputed and undisputed facts, and was not supported by any admissible evidence controverting any of the facts listed in Central Valley's separate statement. Judgment in favor of Central Valley was entered on January 30, 2020. The Nusbaums timely appealed, represented by new counsel.

## DISCUSSION

### I. CLAIMS OF PROCEDURAL ERROR

The Nusbaums contend the trial court abused its discretion in deciding two procedural issues. First, they contend granting summary judgment based on their failure to file an opposing separate statement of facts was the equivalent of a terminating sanction and they should have been given an opportunity to file a proper separate statement. Second, they contend the court should have continued the hearing sua sponte

to give them more time to obtain new counsel or submit a proper separate statement in opposition to the summary judgment motion.

A.     Lack of a Separate Statement

The trial court's minute order stated: "The evidence submitted by Defendant Central Valley Concrete, Inc. in Support of its Separate Statement of Undisputed Fact establishes a prima facie case that Defendant Central Valley Concrete, Inc. is entitled to judgment as a matter of law on the grounds that Defendant Central Valley Concrete, Inc. is entitled to immunity pursuant to [section] 846. This shifts the burden of proof to Plaintiffs to provide admissible evidence that establishes a triable issue of material fact. The opposition filed by Plaintiff Daniel Nusbaum and Plaintiff Iris Nusbaum argues that Defendant was negligent, but does not address the immunity argument raised in the moving papers, is not supported by a Separate Statement of Disputed and Undisputed Fact, and is not supported by any admissible evidence controverting any of the 67 Undisputed Facts listed in Defendant's Separate Statement. Accordingly, the motion by Defendant Central Valley Concrete, Inc. for summary judgment is GRANTED."

The papers filed in opposition to a summary judgment motion "shall include a separate statement that responds to each of the material facts contended by the moving party to be undisputed, indicating if the opposing party agrees or disagrees that those facts are undisputed." (Code Civ. Proc., § 437c, subd. (b)(3).) "Failure to comply with this requirement of a separate statement may constitute a sufficient ground, in the court's discretion, for granting the motion." (*Ibid*.) Thus, the plain language of the statute gives trial court's the discretionary authority to grant a summary judgment motion if the opposing party does not file a proper separate statement. Accordingly, a "trial court's decision to grant a motion for summary judgment because the opposing party failed to comply with the requirements for a separate statement … is reviewed for an abuse of discretion." (*Parkview Villas Assn., Inc. v. State Farm Fire & Casualty Co.* (2005) 133

7.

Cal.App.4th 1197, 1208 (*Parkview*); *Collins v. Hertz Corp.* (2006) 144 Cal.App.4th 64, 67 (*Collins*).)

Based on the Nusbaums' argument, we consider whether the trial court abused this discretionary authority when it granted the motion for summary judgment. The reporter's transcript and the court order quoted above show the trial court did not grant Central Valley's motion for summary judgment based on the discretionary authority set forth in subdivision (b)(3) of Code of Civil Procedure section 437c. Rather, the trial court employed the three-step analysis used to decide motions for summary judgment on their merits. (See *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 849–850 (*Aguilar*).) As a result, this case is distinguishable from *Security Pacific National Bank v. Bradley* (1992) 4 Cal.App.4th 89 (*Security Pacific*), where "[t]he sole ground for granting the Bank's motion for summary judgment was Bradley's failure to file a separate responsive statement to the Bank's statement of undisputed facts. The trial court never reached the merits of the Bank's motion." (*Id*. at p. 93.) We conclude that because the trial court did not rely on its discretionary authority in granting Central Valley's motion for summary judgment, the court did not abuse that discretion.

B.      Failure to Grant a Third Continuance

Another aspect of the trial court's discretionary authority when faced with an unopposed motion for summary judgment or an opposition that is defective is to continue the hearing to permit the filing of a proper separate statement. (*Security Pacific*, *supra*, 4 Cal.App.4th at p. 94.) In *Collins*, *supra*, 144 Cal.App.4th 64, the court determined that when an opposing party's separate statement is improper or deficient, "an immediate grant of summary judgment is, in most instances, too harsh a consequence." (*Id*. at p. 74, italics added.) Similarly, in *Parkview*, *supra*, 133 Cal.App.4th 1197, the court stated that, in the absence of an adequate separate statement from the opposing party, "the proper response in most instances, if the trial court is not prepared to address the merits of the

8.

motion in light of the deficient separate statement, is to give the opposing party an opportunity to file a proper separate statement rather than entering judgment against that party based on its procedural error." (*Id*. at p. 1211.)  However, simply granting an opportunity to file proper opposition papers usually does not fulfill the trial court's responsibilities.  In *Collins*, the court explained the appropriate judicial action, stating: "The trial court specified deficiencies in appellants' initial filing, identified the precise manner in which those deficiencies could be rectified, and afforded appellants ample opportunity to prepare new papers in compliance with applicable rules.  Precisely this and no more was required." (*Collins*, *supra*, at p. 74, italics added.)  Based on these cases, we consider whether the trial court abused its discretion by ruling on the merits of the summary judgment motion at the December 2019 hearing instead of continuing the hearing sua sponte with an explanation of the deficiencies in the Nusbaums' opposition papers.

The earlier continuances of the summary judgment hearing are relevant to this issue.  At the August 28, 2019 hearing on the Nusbaums' first application to continue the hearing, the trial court stated that it wanted to "make very clear to plaintiffs … that they are under a duty to use diligent efforts to procure counsel and that counsel is to come into the case and perform whatever is necessary in order to conclude the discovery, address, and oppose the summary judgment, assuming that they are going to oppose it, but few don't.  They usually do.  And then be prepared to go to trial.  The Court would not be inclined for a future date to continue the case simply because counsel believes then that they don't have an adequate time."  While the Nusbaums did not attend that hearing (their former counsel specially appeared on their behalf), the trial court explained the responsibilities the Nusbaums were expected to fulfill during the additional time granted.  Thus, the court appears to have been aware of the case law stating trial courts should specify the deficiencies in the opposition and provide the opposing party an opportunity to file appropriate opposition papers.

On October 28, 2019, the Nusbaums filed a second application to continue the summary judgment hearing, the trial date, and the related discovery deadlines. At the October 30, 2019 trial setting conference, the trial court granted the Nusbaums' application, reset the summary judgment hearing for December 12, 2019, and reset the trial date for March 3, 2020. The appellate record does not contain a reporter's transcript of the oral proceedings at that conference. Thus, the record is silent on the issue of whether the court gave the Nusbaums the requisite explanation of the need for a separate statement and the other requirements for a proper opposition.

The uncertainty about what occurred at the October 2019 conference is resolved using the long-established principles of appellate procedure. " 'A judgment or order of the lower court is *presumed correct*. All intendments and presumptions are indulged to support it on matters as to which the record is silent, and error must be affirmatively shown. This is not only a general principle of appellate practice but an ingredient of the constitutional doctrine of reversible error.' " (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564 (*Denham*).) A necessary corollary of the presumption of correctness and the related requirement that appellants affirmatively demonstrate error is that if the record is inadequate for meaningful review, the issue must be resolved against the appellant. (*Jameson v. Desta* (2018) 5 Cal.5th 594, 609.) Under the foregoing principles, we must presume that, at the October 2019 conference, the trial court provided the Nusbaums with an appropriate explanation of the need for a separate statement as part of their opposition to the summary judgment motion. The record provided does not affirmatively negate this presumption and, therefore, appellants have not shown the trial court abused its discretion by *failing to explain the requirements for proper opposition papers*. Consequently, we presume the trial court explained those requirements to the Nusbaums.

Next, we consider whether the trial court abused its discretion at the December 2019 hearing by failing to sua sponte continue the hearing. It would have been the third continuance of the hearing—the first was filed in August 2019 and the second was filed

by the Nusbaums as self-represented plaintiffs in October 2019. Accordingly, the record shows the Nusbaums were familiar with the process for obtaining a continuance. Though familiar with the process, the Nusbaums did not file an application to continue the December 2019 hearing. Also, the reporter's transcript of that hearing shows that they did not orally request a continuance despite open-ended questions by the court if they had "[a]ny other issues that you want to bring up regarding the summary [] judgment" and "[a]nything else." Thus, any continuance would have been sua sponte.

Additional circumstances relevant to the exercise of the trial court's discretion is that nothing in the record suggested a further continuance would have resulted in the Nusbaums finding new counsel. At the August 2019 hearing on the Nusbaums' ex parte application for a continuance, their departing counsel told the trial court it was "very unlikely" that the Nusbaums would have a new attorney. Also, Central Valley's attorney told the trial court that he had "been hearing that they've been looking for new counsel since November of 2018. I've received multiple calls since November 2018 from attorneys inquiring about the status of the case, wanting to know information about it." The court also received information from the Nusbaums. At the December 2019 hearing, Daniel Nusbaum directly addressed the topic of finding new counsel, stating "we tried hard. Real hard. I called thirty, thirty-five, maybe forty lawyers. I finally quit doing that. And most of them don't want to touch this case." Moreover, the Nusbaums had by that time prepared and filed an opposition to Central Valley's motion for summary judgment without benefit of counsel. Based on this information, it was reasonable for the trial court to conclude that a further continuance would not have resulted in the Nusbaums securing new counsel.

Further circumstances relevant to a sua sponte continuance include the posture of the case. By the time of the December 2019 hearing, discovery had been ongoing for some three years with the Nusbaums represented by counsel, and one motion for summary judgment had already been fully briefed and decided by the court. Thus, much

11.

of the case had been litigated with the assistance of counsel, particularly with respect to discovery. Also, the trial judge who ruled on the summary judgment motion had handled the case from its commencement. He was, to use his own words, "very familiar with this case."

Based on the foregoing, we conclude the trial court did not act arbitrarily, capriciously or beyond "the bounds of reason" when it weighed the circumstances and decided not to continue the hearing sua sponte. (*Denham*, *supra*, 2 Cal.3d at p. 564 [abuse of discretion standard].) Various factors indicate that it was unlikely the Nusbaums would be able to retain new counsel and rectify their opposition papers if granted a further continuance. In other words, the court reasonably determined the time had come to rule on the summary judgment motion rather than continuing the hearing.

We recognize that in *Security Pacific*, *supra*, 4 Cal.App.4th 89, the appellate court determined the trial court abused its discretion by failing to grant more time to the self-represented defendant even though he had not requested a continuance. (*Id*. at pp. 93, 96.) The Nusbaums' circumstances are distinguishable from those of *Security Pacific*, where no continuances had been granted to the self-represented defendant before summary judgment was granted. (See *Rush v. White Corp.* (2017) 13 Cal.App.5th 1086, [trial court did not abuse its discretion in granting summary judgment where it had notified plaintiffs of the problems with their separate statements and continued the hearing to give them an opportunity to correct the errors].)

II.     MERITS OF THE MOTION FOR SUMMARY JUDGMENT

A.      Basic Legal Principles

A motion for summary judgment "shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) Here, Central Valley attempted to establish it was entitled to judgment as a matter of law by

12.

showing the "action has no merit" because "there is a complete defense." (Code Civ. Proc., § 437c, subds. (a)(1), (p)(2).) The complete defense asserted is the landowner immunity set forth in section 846.

A trial court's decision to grant a motion for summary judgment ordinarily is reviewed de novo. (*Batarse v. Service Employees Internat. Union, Local 1000* (2012) 209 Cal.App.4th 820, 827.) A summary judgment motion raises only questions of law regarding the construction and effect of the supporting and opposition papers, and appellate courts independently apply the same three-step analysis required of the trial court. (*Ibid.*) First, we identify issues framed by the pleadings. Second, we determine whether the moving party's showing established facts that negate the opponent's claim and justify a judgment in the moving party's favor. Third, if the moving party carried its initial burden, we determine whether the opposition demonstrates the existence of a triable issue of material fact. (*Ibid.*)

B.      Recreational Premises Liability Immunity

As background for identifying the specific issues framed by the pleadings, we consider the principles of law that define the immunity and its exceptions. The Legislature enacted section 846 in 1963 to immunize private landowners such as Central Valley from liability they would otherwise incur for ordinary negligence towards uninvited, nonpaying recreational users. (*New v. Consolidated Rock Products Co.* (1985) 171 Cal.App.3d 681, 688 (*New*).) Subdivision (a) of section 846 provides: "An owner of any estate or any other interest in real property, whether possessory or nonpossessory, owes no duty of care to keep the premises safe for entry or use by others for any recreational purpose or to give any warning of hazardous conditions, uses of, structures, or activities on those premises to persons entering for a recreational purpose, except as provided in this section." This text "plainly extended recreational use immunity to a broad class of land owners—it did not limit the statute to agricultural or rural land, to

13.

land in an undeveloped or natural condition, or to land otherwise 'suitable' for recreation." (*Ornelas v. Randolph* (1993) 4 Cal.4th 1095, 1109.)

A " 'recreational purpose,' " as used in section 846, "includes activities such as fishing, hunting, camping, water sports, hiking, spelunking, sport parachuting, riding, including animal riding, snowmobiling, and all other types of vehicular riding, rock collecting, sightseeing, picnicking, nature study, nature contacting, recreational gardening, gleaning, hang gliding, private noncommercial aviation activities, winter sports, and viewing or enjoying historical, archeological, scenic, natural, or scientific sites." (§ 846, subd. (b).) Use of the word "includes" in conjunction with the use of "any" in the phrase "any recreational purpose" in subdivision (a) of section 846 indicates that the Legislature intended the immunity to apply beyond those recreational purposes specifically listed. (See *Hassan v. Mercy American River Hospital* (2003) 31 Cal.4th 709, 717 [use of " 'including' " in a statute is " 'ordinarily a term of enlargement rather than limitation,' " and generally indicates the list that follows is illustrative, not exhaustive].) For example, retrieving a kite is not an activity listed in the statute, but it was determined to be a use of property for a recreational purpose. (*Jackson v. Pacific Gas & Electric Co.* (2001) 94 Cal.App.4th 1110, 1115.)

Exceptions to the statutory immunity are set forth in subdivision (d) of section 846, which states that the "section does not limit the liability which otherwise exists for any of the following: [¶] (1) Willful or malicious failure to guard or warn against a dangerous condition, use, structure or activity. [¶] (2) Injury suffered in any case where permission to enter for [a recreational] purpose was granted for a consideration other than the consideration, if any, paid to said landowner by the state, or where consideration has been received from others for the same purpose. [¶] (3) Any persons who are expressly invited rather than merely permitted to come upon the premises by the landowner."

## C. Issues Framed by the Pleadings

Having set forth the text that defines section 846's landowner immunity and the exceptions, we return to the first step of the summary judgment analysis. That step requires the court to identify the issues framed by the pleadings. The relevant pleadings are the FAC and Central Valley's answer, which asserts section 846's immunity as an affirmative defense. As stated previously, Central Valley's summary judgment motion relies on this immunity as "a complete defense" (Code Civ. Proc., § 437c, subd. (p)(2)) to the Nusbaums' action.

The FAC alleged actions and omissions by Central Valley constituted negligence, including leaving the gates to the Property open, failing to place trespass signs or take other action to prevent entry, failing to place warnings and safety equipment around the silos and other dangerous equipment, and failing to train its employees the proper way to approach someone they believed should not be on the property. In addition, the FAC alleged (1) Central Valley employees did not identify themselves to Luke as employees and began to chase him, "calling hi[m] names and threaten[ing] to do physical harm;" (2) Luke ran from the employees, fearing they meant him harm; and (3) Luke began to climb the silo's ladder due to the threats by those chasing him, seeing it was the only place that afforded him safety. The FAC alleged an employee continued to chase Luke up the ladder, even though the employee knew or should have known that by chasing Luke up the stairs created a risk Luke would lose his balance and fall to his death. In essence, the FAC alleges Luke's death was caused by negligent acts and omissions and by intentional acts. Accordingly, the broad issue framed by the FAC's allegations and Central Valley's assertion of immunity are whether the section 846 immunity applies to Central Valley's conduct, which includes the narrower issue of whether that conduct falls within one of the exceptions to immunity.

15.

D.    Central Valley's Prima Facie Showing Carried Its Burden

Undertaking the second step of the summary judgment analysis, we "exercise an independent review to determine if the defendant moving for summary judgment met its burden of establishing a complete defense or of negating each of the plaintiff's theories and establishing that the action was without merit." (*Fisherman's Wharf Bay Cruise Corp. v. Superior Court* (2003) 114 Cal.App.4th 309, 320; see *Aguilar*, *supra*, 25 Cal.4th at p. 849.)

### 1.    The Property falls within section 846's coverage

Section 846 applies to "[a]n owner of any estate or any other interest in real property, whether possessory or nonpossessory." (§ 846, subd. (a).) Central Valley's separate statement of undisputed material facts asserts the Property was real property owned and used by Central Valley. The Nusbaums did not dispute this fact in the trial court and do not contest it on appeal. Consequently, we conclude the Property falls within section 846's coverage because Central Valley owns a possessory "estate or any other interest in real property." (Civ. Code, § 846, subd. (a).)

### 2.    Meditation is a use for a recreational purpose

Section 846 applies to "entry or use by others for *any* recreational purpose" onto property. (Civ. Code, § 846, subd. (a), italics added.) Central Valley's separate statement of undisputed material facts asserts Luke was training to become a Buddhist monk and his sole purpose at the time of his entry onto the Property was to practice a form of meditation in a place with loud noises. We conclude the activity of meditation is recreational, intended to "refresh body and mind" (Webster's New World Dict. (2d concise ed. 1975) p. 624), and is akin to the activities of hiking, nature study, and nature contacting, which are specifically listed in section 846. Consequently, Central Valley established that Luke entered onto the Property for a "recreational purpose" as that term is used in section 846.

16.

### 3. *Luke did not pay to enter the Property and was not invited*

Under section 846's second and third exceptions, a landowner is not immune from liability that otherwise exists for injuries suffered where permission to enter the property for a recreational purpose was granted in exchange for consideration or where the person was expressly invited to come onto the property by the landowner. (§ 846, subd. (d)(2), (3).) In other words, section 846's immunity encompasses injuries suffered by an uninvited, nonpaying recreational user of land. (*New*, *supra*, 171 Cal.App.3d at p. 688.)

Central Valley's separate statement of undisputed material facts asserts that Central Valley did not charge Luke or anyone else an entry fee, or any other consideration, for permission to enter the Property. It also asserts that Luke was not invited onto the Property by anyone at Central Valley. The Nusbaums did not dispute these facts in the trial court and did not contest them on appeal. Therefore, we conclude Central Valley carried its burden of showing that the exceptions in paragraphs (2) and (3) of subdivision (d) of section 846 did not prevent it from being immune.[2]

### 4. *Summary*

Central Valley's separate statement and supporting evidence has established that (1) the Property falls within the coverage of section 846; (2) Luke entered the Property to meditate, which is a recreational purpose covered by section 846; and (3) Luke entered the Property as an uninvited, nonpaying user. Consequently, Central Valley need only show that the statutory exception for willful or malicious conduct does not apply to carry

---

[2] For purposes of this appeal, we assume without deciding a defendant's burden of showing "a complete defense to the cause of action" (Code Civ. Proc., § 437c, subd. (p)(2)) required Central Valley to make a prima facie showing that the immunity in subdivision (a) of section 846 applied *and* the exceptions in subdivision (d) did not apply. Stated another way, the burden of addressing the exceptions falls on the moving party defendant, not the plaintiff. (See generally, *Bacon v. Southern Cal. Edison Co.* (1997) 53 Cal.App.4th 854, 858–859 [shifting burden of summary judgment and section 846 immunity].)

its burden of establishing the section 846 immunity as a complete defense to the Nusbaums' action.

E.    Willful Misconduct Exception to Landowner Immunity

The opposition the Nusbaums filed in the trial court did not address the section 846 immunity or mention the exception for willful misconduct. On appeal, the Nusbaums contend that the exception applies to Central Valley's conduct, and that the evidence provided by Central Valley to support its summary judgment motion shows the existence of triable issues of material fact as to willful misconduct.

1.    *Legal principles defining the exception*

Under section 846, a landowner is not immune from liability that otherwise exists for "[w]illful or malicious failure to guard or warn against a dangerous condition, use, structure or activity." (§ 846, subd. (d)(1).) Although the statutory text is limited to failures to "guard" or "warn," the exception has been interpreted as applying to all types of willful misconduct for which tort liability attaches under California law. (See *New*, *supra*, 171 Cal.App.3d at pp. 691–692.) In *New*, the court described the type of misconduct falling within the exception:

> "The concept of wilful misconduct has a well-established, well-defined meaning in California law. 'Willful or wanton misconduct is intentional wrongful conduct, done either with a knowledge that serious injury to another will probably result, or with a wanton and reckless disregard of the possible results. [Citation.]' [Citation.]"

> " ' "Wilful or wanton misconduct' travels under several other names. Its aliases include "serious and wilful misconduct," "wanton misconduct," "reckless disregard," "recklessness," and combinations of some or all of these. These terms are interchangeable because they all identify the same thing—"an aggravated form of negligence, differing in quality rather than degree from ordinary lack of care" [citations]. "The usual meaning assigned to 'wilful,' 'wanton' or 'reckless,' according to taste as to the word used, is that the actor has intentionally done an act of an unreasonable character in disregard of a risk known to him or so obvious that he must be

18.

taken to have been aware of it, and so great as to make it highly probable that harm would follow." [Citation.]' [Citation.]

" 'Three essential elements must be present to raise a negligent act to the level of wilful misconduct: (1) actual or constructive knowledge of the peril to be apprehended, (2) actual or constructive knowledge that injury is a probable, as opposed to a possible, result of the danger, and (3) conscious failure to act to avoid the peril. [Citations.]' [Citation.]" (*New*, *supra*, 171 Cal.App.3d at pp. 689–690.)

Similarly, our Supreme Court has stated the appropriate standard for willful misconduct requires " 'the intentional doing of something either with knowledge, express or implied, that serious injury is a *probable*, as distinguished from a possible, result, or the intentional doing of an act with a wanton and reckless disregard of its consequences.' " (*Ewing v. Cloverleaf Bowl* (1978) 20 Cal.3d 389, 402, italics added and quoting *Williams v. Carr* (1968) 68 Cal.2d 579, 584.)

### 2. *Evidence relied upon by the Nusbaums*

The Nusbaums refer to the deposition testimony of three Central Valley employees and contend that testimony establishes Central Valley recognized the silo was a dangerous structure, and that more broadly the Property as a whole was a dangerous area for the general public, hence its closure to the general public. More specifically, the Nusbaums contend that despite knowing that climbing the silo was a dangerous activity requiring specialized training, Central Valley employees chased Luke to its top with a conscious disregard for the peril that created. These contentions on appeal echo the interpretation of the evidence contained in the opposition to the summary judgment motion the Nusbaums filed in the trial court.

The evidence includes the depositions of Central Valley employees Sandoval, Nunez, and Brandon Williams, a trucking supervisor and estimator; photographs of the Property, including its gate, the signs on the gate, the two silos, and the caged ladder on the shorter silo that Luke climbed; and three security camera videos showing Luke on the Property.

19.

The deposition testimony of Sandoval and Nunez establishes that the first Central Valley employee to encounter Luke after he entered the Property was Sandoval. As Sandoval's and Luke's paths intersected and they were about five feet apart, Sandoval asked Luke, "Can I help you?" Sandoval testified Luke looked toward the truck wash and a silo, which were further into the Property, pointed in that direction, made a grunting noise, and began to sprint in that direction. This testimony establishes that Luke began to run toward the silo on his own initiative, not because he was chased, threatened, or called names.

Sandoval testified he did not immediately run after Luke. Nunez, came up to Sandoval after Luke began running and said something was not right about him. Sandoval said yes to Nunez and followed Luke. Nunez followed behind Sandoval. Sandoval estimated he began sprinting after Luke a couple of seconds before Luke reached the silo and started climbing its ladder. When Sandoval saw Luke grab the ladder to the silo, Sandoval yelled for Luke to stop. A sign chained to the ladder and its cage stated, "Authorized Personnel Only." Luke ignored the sign and proceeded to climb the ladder. When Luke was halfway up the ladder, Sandoval yelled a second time for Luke to stop. Employees on the other side of the silo who were washing trucks also yelled "stop" and "[h]ey, what are you doing." There is no evidence that the employees yelled at Luke before he started to climb the silo or that Sandoval or the other employees called Luke names or otherwise yelled at him in a threatening way.

Nunez testified that he and Sandoval initially walked after Luke. Nunez increased his speed when he saw Luke climbing the silo. As Nunez went towards the silo, he did not yell anything. When Nunez was at the base of the ladder and looked up, he could not see Luke because Luke had already climbed to the top of the silo. Photographs of the silo shows it had a guardrail around its top. Nunez then started to climb the ladder, getting his head and part of his body into the ladder's cage. Nunez testified he stopped climbing because he heard Luke's body hit the ground. Sandoval testified he grabbed Nunez and

told him to stop and that he was not going up. Sandoval then heard screams from the employees washing trucks, glanced up, saw Luke coming down head first, and saw him hit the ground a few feet from the silo and about five feet away from Sandoval. Luke did not scream or saying anything on his way down.

The three videos from the security cameras support the deposition testimony. The first video begins showing Luke shortly after he entered the Property through the open gate, shows him reaching Sandoval, and then shows him starting to run further into the Property. Luke exits the right side of the frame a stride or two after he began running. This video of Luke's encounter with Sandoval does not depict Sandoval aggressively confronting Luke, yelling at Luke, or even chasing after Luke. Rather, it shows Sandoval maintained a calm, even demeanor in the face of an unidentified, unaccompanied person appearing on the Property. Additionally, it confirms that Luke, not Sandoval, initially broke into a run.

The second video shows Luke running alone further into the Property past parked trailers and a semi-truck. No one else is in the frame with Luke while he appears in this video (i.e., he is not being pursued by Central Valley employees). About six seconds after Luke exits the frame to the right, Sandoval enters the frame from the left, walking after Luke. Then another employee (probably Nunez) enters the frame and appears to exchange words with Sandoval. Sandoval continues to walk after Luke and, as Sandoval approaches within a few paces of the edge of the frame, he begins running. Two other employees follow.

The third video partially overlaps with the second video. It begins by showing Luke run past the parked semi-truck and, further on, turning toward the silo. Luke then disappears behind a trailer. Beyond the trailer, the video shows the upper part of the silo. A building or shed blocks the lower part of the silo and, as a result, the video does not show Luke reaching the silo and beginning to climb. As Luke climbed the silo's ladder, his head reappears on the video as he gets far enough up the ladder to emerge from

21.

behind the trailer. At that point, the video shows Sandoval breaking into a sprint toward the silo. As Luke continues to climb the silo, the two other employees are shown sprinting toward the silo taking the same route as Luke and Sandoval. The lead employee disappeared behind the trailer as Luke reached the top of the ladder and appeared to set his foot on the top of the silo. The video ends at that point. It does not show Luke's fall.

There is no evidence in the depositions or the three videos that Central Valley employees cornered Luke at the base of the silo, or otherwise forced him to mount its ladder. Also, the videos do not show anyone climbing on the visible portion of the ladder after Luke, which is consistent with Nunez's testimony that he did not begin his short ascent up the ladder until Luke had already reached the top and could not be seen from the bottom.

The question presented is whether the foregoing evidence creates a triable issue of fact about willful misconduct by Central Valley's employees. "There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Aguilar*, *supra*, 25 Cal.4th at p. 850, fn. omitted.) The evidence shows that the employees followed Luke toward the silo, began running only after Luke started to climb the ladder, and yelled at him to stop or to ask what he was doing. These acts were intentional. Consequently, for purposes of determining whether the evidence creates a triable issue of fact about willful misconduct, we consider whether the evidence supports a finding that those intentional acts were done "either with knowledge, express or implied, that serious injury is a *probable*, as distinguished from a possible, result," or were done "with a wanton and reckless disregard of its consequences." (*Ewing v. Cloverleaf Bowl*, *supra*, 20 Cal.3d at p. 402.)

We conclude a trier of fact, presented with the evidence in the appellate record, could not reasonably find that the actions were done with the knowledge that it was probable the employee's actions would cause a serious injury. Luke's own actions in

22.

coming onto the Property without shoes, running from the employees, and climbing the silo created the risk of serious injury. Confronted with these facts, the employees could not reasonably let Luke roam the Property unattended and could not reasonably have left him once he ignored the sign and started climbing the silo's ladder. In other words, while the employee's actions were intentional, those acts do not meet the standard of being reckless, wanton, or undertaken with the knowledge that the employee's actions (as compared to Luke's actions) would probably cause serious injury. More fundamentally, the evidence does not support the Nusbaums' allegations that Central Valley employees chased Luke, called him names, and threatened to do him physical harm.

The Nusbaums' opening brief asserts the wrongful intent or recklessness is shown by Nunez's testimony that the conduct of Central Valley's employees would scare Luke and give him fear. This assertion does not accurately describe the evidence. The testimony referred to was given by Daniel Nusbaum, not Nunez, and is based on Daniel Nusbaum's interpretation of the sheriff's report of the incident. He states that the acts described in the report "could have effect upon him, would give him fear." This testimony is not based on first-hand knowledge and does not tend to prove the employees' actions were wrongful—that is, undertaken with the knowledge that a serious injury was the probable result. (See *Manuel v. Pacific Gas & Electric Co.* (2009) 173 Cal.App.4th 927, 947 [willful misconduct involves a positive intent actually to harm another or to do an act with a positive, active and absolute disregard of its consequences].)

Accordingly, we conclude that the evidence presented by Central Valley was sufficient to carry its burden of negating the willful misconduct exception to the section 846 immunity. Also, to the extent the Nusbaums rely on evidence in the record that was not directly referenced by Central Valley in support of the facts asserted in its separate statement, the evidence cited by the Nusbaums does not establish the existence of a triable issue of material fact about willful misconduct.

23.

F.      Amendment to Allege a Cause of Action for Willful Misconduct

The Nusbaums' reply brief asserts they could have amended the FAC to allege a cause of action for willful misconduct. This argument was made in response to Central Valley's assertion that the Nusbaums failed to allege such a cause of action. We have rejected Central Valley's argument that such a cause of action must be alleged to raise the applicability of the willful misconduct exception to the section 846 immunity. (See § 846, subd. (d)(1).) Instead, we have analyzed the allegations in the FAC about chasing, yelling and threatening Luke as types of intentional actions that might have qualified as willful misconduct for purposes of that exception. Thus, had such a cause of action been included in the FAC, the motion for summary judgment still would have been granted and upheld based on the evidence presented. Therefore, we need not address the issue of amendment further.

G.      Conclusion

First, the trial court did not abuse its discretion in ruling on Central Valley's motion for summary judgment without sua sponte affording the Nusbaums an additional continuance to retain new counsel and prepare a different opposition accompanied by a separate statement and supporting evidence. Second, the trial court correctly determined Central Valley carried its burden of establishing the applicability of section 846's immunity to Central Valley on the facts of this case. Third, the evidence referenced by the Nusbaums on appeal does not carry their burden of establishing the existence of a triable issue of fact about the application of the immunity or its exceptions. Therefore, the trial court correctly granted the motion for summary judgment.

## DISPOSITION

The January 30, 2020 judgment is affirmed.  Central Valley shall recover its costs on appeal.

FRANSON, J.

WE CONCUR:

HILL, P. J.

PEÑA, J.